UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| JEFFREY A. PHILLIPS, SR., JERRY THOMAS, and LAWRENCE DAVIS, SR., )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>CONNOR CORPORATION, WILLIAM )<br>(BILL) ESTHER, JACK LAWSON, and )<br>HEATHER FOLEY, )<br>)<br>Defendants. ) | CAUSE NO.: 1:07-CV-36 |

## OPINION AND ORDER

### I.  INTRODUCTION

Plaintiffs Jeffrey A. Phillips, Sr., Jerry Thomas, and Lawrence Davis, Sr., who are African-American, bring this suit against their former employer, Defendant Connor Corporation ("Connor"), and several of its employees, asserting that Defendants discriminated against them in violation of 42 U.S.C. § 1981 on the basis of race in connection with a reduction in force.[1] (Docket # 1.)  Plaintiffs, however, do not challenge their selection for layoff; rather, they allege that Connor's decision to later classify their terminations as voluntary resignations was discriminatory, a decision which denied them certain insurance coverage, unemployment benefits, and employment training. (Compl. 2-3.)

On January 30, 2008, Defendants moved for summary judgment on all claims (Docket # 25), and the matter is now fully briefed. (Docket # 26, 29, 30.)  For the following reasons,

---

[1] Subject matter jurisdiction arises under 28 U.S.C. § 1331.  Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

Defendants' motion for summary judgment will be GRANTED IN PART and DENIED IN PART.

## II.  FACTUAL BACKGROUND[2]

*A.  The Events Leading Up to Connor's February 9, 2007, Reduction In Force*

On July 1, 2002, Connor entered into a new three-year collective bargaining agreement with its unionized workforce at its Fort Wayne, Indiana plant, the Retail Wholesale and Department Store Union (the "Union"). (Foley Aff. ¶ 5; Mem. of Law in Supp. of Defs.' Mot. for Summ. J. ("Mem. of Law") Ex. A.)  At that time, Connor employed approximately sixty bargaining unit employees at its Fort Wayne plant. (Foley Aff. ¶¶ 7, 8.)  Upon expiration of that agreement three years later, Connor and the Union entered into an Addendum, extending the term of the collective bargaining agreement to December 31, 2006. (Mem. of Law Ex. B.)  By then, Connor employed only twenty bargaining unit employees at its Fort Wayne plant. (Foley Aff. ¶ 8.)

In October 2006, facing a significant economic differential between domestically produced parts and those procured from overseas, Connor's Plant Manager, Heather Foley, informed David Altman, the President of the Indiana Joint Board and the Representative of the Union, that Connor had decided to cease manufacturing at its Fort Wayne plant as of December 31, 2006, the date on which the current collective bargaining agreement was set to expire. (Pl.'s Mem. of Law in Opp'n of Defs.' Mot. for Summ. J. ("Resp. Br.") Ex. 1; Foley Aff. ¶ 10.)  Foley further explained that Connor planned to transform the Fort Wayne plant into a distribution

---

[2] For summary judgment purposes, the facts are recited in the light most favorable to Plaintiffs, the nonmoving party. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).  Insofar as Plaintiffs do not controvert the facts asserted by Defendants in their "Statement of Material Fact," those facts "are admitted to exist without controversy" as set forth below. *See* N.D. Ind. R. 56.1.

center for products sourced from overseas. (Resp. Br. Ex. 1; Foley Aff. ¶ 10.)  In addition, Foley's correspondence expressed Connor's willingness to negotiate future terms and conditions of employment with respect to the Union's bargaining unit members and Connor's future Fort Wayne operations, if any, following the expiration of the current collective bargaining agreement. (Resp. Br. Ex. 1.)

Shortly thereafter, negotiations commenced among Connor, Altman, and the members of the local Union bargaining committee, which included Plaintiffs Jeffrey Phillips, Sr., and Jerry Thomas, who served as Chairman and Vice Chairman of that committee, respectively. (Foley Aff. ¶¶ 11-14; Altman Aff. ¶¶ 6-8; Phillips Aff. ¶¶ 6, 8; Thomas Aff. ¶¶ 6, 8.)  From the outset of these negotiations, Connor shared with the local Union bargaining committee its projection that only seven jobs would be required to support its distribution center operations, six of which would be available to bargaining unit employees. (Foley Aff. ¶ 16.)  It further consistently expressed throughout the negotiations that Connor would fully honor the seniority provisions of the current collective bargaining agreement. (Phillips Aff. ¶ 9; Thomas Aff. ¶ 9; *see* Mem. of Law Ex. A.)

Given the inability of the parties to confirm a timetable for the Fort Wayne plant's transformation, Connor and the Union negotiated an Extension Agreement, extending the current collective bargaining agreement until March 31, 2007. (Foley Aff. ¶ 18.)  This Extension Agreement was then signed by the Union's representatives and ratified by the local Union membership, who by this time had full knowledge of an impending reduction in force. (Altman Aff. ¶ 11; Mem. of Law Ex. D.)

*B. The Events of February 9, 2007*

On February 9, 2007, Connor laid off twelve employees. (Foley Aff. ¶ 26; Resp. Br. Ex. 10.) On that date after the employees' lunch break, Supervisor Dave Tester distributed letters to those individuals who were affected by the conversion of the Fort Wayne plant, which explained that the layoff from employment was effective that day, February 9, 2007. (Resp. Br. Exs. 7-9; Tester Aff. ¶¶ 11, 12.) Though Connor had previously represented that only six positions were available to the bargaining unit employees, ten bargaining unit employees were ultimately retained – two of whom had less seniority than either Phillips, Thomas, or Davis.[3] (*See* Resp. Br. Ex. 10; Altman Aff. ¶ 14.)

Upon distributing layoff letters to Plaintiffs, Tester questioned each as to whether he would complete his shift or leave, to which each responded by choosing to leave. (Phillips Aff. ¶ 14; Thomas Aff. ¶ 14; Davis Aff. ¶ 11.) Upon leaving, Thomas and Davis cleaned their respective work areas and completed their paperwork. (Thomas Aff. ¶ 15; Davis Aff. ¶ 12.) Phillips, who worked as a material handler on that date, was not required to complete any paperwork or perform similar cleaning duties. (Tester Aff. ¶ 17.)

Plaintiffs then gathered near the time clock to exchange condolences with several other first shift employees who had also received layoff letters, including Nanette Peterson, Joyce Caccamo, and Linda Channel, three White bargaining unit employees, and Bridget Bradtmueller, a White non-bargaining unit employee. (Resp. Br. 5; Phillips Aff. ¶ 16; Thomas Aff. ¶ 17; Davis Aff. ¶ 14; *see generally* Tester Aff. ¶¶ 18, 24.) While the group was gathered near the time

---

[3] Defendants explain that the two employees who were retained with less seniority than Plaintiffs possessed certain qualifications that Plaintiffs did not, which it contends is not a violation of the seniority terms of the collective bargaining agreement. (Reply Br. 3-4.) This fact is of no real import, however, because as stated *supra*, Plaintiffs do not challenge their selection for layoff with respect to Connor's reduction in force.

clock, Tester expressed his condolences and offered to provide them references in the future if needed. (Phillips Aff. ¶ 17; Thomas Aff. ¶ 18; Davis Aff. ¶ 15.)  Plaintiffs, Peterson, Caccamo, Channel, and Bradtmueller then clocked out within minutes of each other.[4] (Resp. Br. Ex. 13; *see also* Tester Aff. ¶ 21.)

Tester gave layoff letters to four other first shift employees: Nicole Thomas, an African-American female; Therisa Hargis, a White female; and Elba Leiva and Irene Gomez, both Hispanic females. (Tester Aff. ¶ 23.)  However, these four employees worked the balance of their shift after receiving their layoff letters. (Tester Aff. ¶ 23.)

Tester also gave a layoff letter to Michael Rybolt, a White male bargaining unit employee who worked the second shift, before Rybolt clocked in and started his shift. (Tester Aff. ¶ 22.) When Rybolt stated that he did not think he could work, Tester permitted him to leave the plant

---

[4] Defendants tell a slightly different version of the interaction that occurred between the time that Tester distributed the layoff letters and Plaintiffs' departures.  Defendants state that when Tester began distributing the letters shortly after the lunch break, he found Phillips still in the break room during work time, away from his assigned work area. (Tester Aff. ¶ 12.)  After giving him the letter, Tester asked Phillips whether he would complete his work shift or leave; Phillips responded, "why should I leave?" (Tester Aff. ¶ 13.)  Shortly thereafter, Tester reports that he found Plaintiffs gathered at the time clock, and Tester told them "if you are going to leave, just go." (Mem. of Law 6 n.7; Tester Aff. ¶¶ 13-15.)  Phillips stated "no use staying" and then left without another word; Thomas stated "ain't no use sticking around" and left; and Davis joined the other two in leaving, but without a parting comment. (Tester Aff. ¶ 15.)  Defendants contend that Thomas and Davis each failed to turn in the paperwork associated with their job assignments that day and failed to clean up their respective work areas. (Tester Aff. ¶ 16.)

After distributing the layoff letters to Plaintiffs, Tester states that he approached Peterson, Caccamo, and Channel, who were performing their work in the same general work area. (Tester Aff. ¶ 18.)  Tester reports that, despite their awareness of an impending layoff, they each became quite agitated and emotional upon receipt of their layoff letters, so much so that they began to experience difficulty operating the presses and controlling their emotions. (Tester Aff. ¶¶ 20, 21.)  Fearing for their well-being and for plant safety, Tester states that he authorized these three employees to leave work if they desired, after completing their paperwork and cleaning their work area. (Tester Aff. ¶¶ 20, 21.)  They departed from the plant shortly after Plaintiffs. (Tester Aff. ¶¶ 20, 21.)

As to Bradtmueller, Tester states that she approached him when he was distributing the layoff letters and asked if she too was being laid off. (Mem. of Law 8; Tester Aff. ¶ 24.)  When Tester handed her the letter, he recalls that she left the plant without seeking or securing permission, making no parting comments. (Mem. of Law 8; Tester Aff. ¶ 24.)

5

without clocking in. (Tester Aff. ¶ 22.)

      *C. The Events Occurring After the February 9, 2007, Reduction in Force*

  Plant Manager Foley, who directed the preparation of the layoff letters and fixed their date for distribution, was away from the plant on other business on February 9, 2007. (Foley Aff. ¶¶ 22, 23.) When Tester informed her what transpired following distribution of the layoff letters, she decided to conduct her own investigation into the events of that date, including reviewing records and interviewing Tester and other employees who were at the plant on February 9, 2007. (Foley Aff. ¶¶ 24-26; Tester Aff. ¶ 24; Mem. in Supp. Ex. I.) Foley, however, did not request to interview Plaintiffs. (Phillips Aff. ¶ 22; Thomas Aff. ¶ 23; Davis Aff. ¶ 20.)

  Based upon her investigation, Foley concluded that Plaintiffs and Bradtmueller had each violated Connor's policy and practice that treated job abandonment as a voluntary resignation akin to an insubordinate refusal to seek permission to depart work, which carried a consequence of immediate termination.[5] (Foley Aff. ¶¶ 25, 29.) In contrast, Foley concluded that Peterson, Caccamo, and Channel were not guilty of job abandonment because of their "emotional breakdowns" and because Tester had authorized their departure. (Foley Aff. ¶ 27.) Foley decided that Rybolt was guilty of merely an unexcused absence, rather than job abandonment, because he left before ever clocking in for his shift. (Foley Aff. ¶ 28.)

  Consequently, Foley sent each Plaintiff and Bradtmueller a letter stating that he or she had "walked off the job" and that the departure had been recorded as a voluntary resignation. (Foley Aff. ¶ 30; Mem. of Law Exs. J-M.) The letters further cite a failure to complete

---

[5] The time cards of Plaintiffs, Peterson, Caccamo, Channel, and Bradtmueller reflect that Tester made a notation on each card for points to be deducted as a consequence of their early departure under Connor's Absenteeism and Tardiness Point and Coding System. (Resp. Br. Ex. 13.)

6

paperwork and attend to their respective work areas as a reason that the departure was being reported as a voluntary resignation.[6] (Mem. of Law Exs. J-M.) As a consequence, the letter informed them that they were no longer eligible for group health insurance for thirty days from their last day worked and that a COBRA notice was forthcoming. (Mem. of Law Exs. J-M.)

As a result of the February 16, 2007, letters, Union Representative Altman filed a grievance with Connor on Plaintiffs' behalf. (Altman Aff. ¶ 15; Foley Aff. ¶ 32; Resp. Br. Ex. 18.) Foley and Altman then met a few days later to discuss the grievance and their individual findings from their respective investigations. (Altman Aff. ¶ 16; Foley Aff. ¶¶ 33, 34.) During this meeting, Altman did not argue that Thomas or Davis had completed their paperwork or cleaned their work area. (Foley Aff. ¶ 35; Altman Aff. ¶ 19.) Thereafter, Foley prepared a written statement of Connor's position that there was no compelling evidence that Thomas or Davis had cleaned their work area or completed their paperwork, or that Plaintiffs had advised Tester of their intent to leave. (Foley Aff. ¶ 36.)

Altman later provided written notice to Connor that the Union was not going to arbitrate the grievance. (Altman Aff. ¶ 23.) Not long thereafter, Plaintiffs filed a *pro se* complaint with the district court against Connor; William Esther, Connor's Chief Executive Officer; Jack Lawson, Connor's Chief Financial Officer; and Plant Manager Foley, alleging that Defendants discriminated against them on the basis of their race when Connor transformed their layoffs into voluntary resignations, denying them certain insurance coverage, unemployment benefits, and employment training. (Docket # 1.)

---

[6] As articulated *supra*, Defendants concede that Phillips had no responsibility to perform paperwork or clean a work area on February 9, 2007, due to his assignment as a material handler.

## III.  STANDARD OF REVIEW

Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne*, 337 F.3d at 770.  When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.*  The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994); *see also Sun v. Bd. of Trs. of Univ. of Ill.*, 473 F.3d 799, 812 (7th Cir. 2007).

If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770.  A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.*  However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771.

## IV. DISCUSSION

### A.  Applicable Law

A plaintiff alleging employment discrimination under 42 U.S.C. § 1981 can contest summary judgment by using either the direct or indirect method of proof. *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1060 n.4 (7th Cir. 2003); *see Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 299 (7th Cir. 2004) (stating that § 1981 claims are evaluated under the same rubric as Title VII claims); *see also Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403 (7th Cir. 2007) (collecting

8

cases).  The direct method requires the plaintiff to produce enough evidence, either direct or circumstantial, "that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption." *Cerutti*, 349 F.3d at 1061.

The indirect method is the well-known *McDonnell Douglas* burden-shifting framework. *See, e.g.*, *id.*  Here, the plaintiff must first establish a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  In order to establish a prima facie case of racial discrimination under § 1981, the plaintiff must show that "(1) he is a member of a protected class; (2) he was meeting his employer's legitimate expectations at the time of the alleged adverse action; (3) he was subjected to an adverse employment action; and (4) the employer treated similarly situated employees not in the protected class more favorably." *Scaife v. Cook County*, 446 F.3d 735, 739 (7th Cir. 2006); *see also Herron*, 388 F.3d at 299.  If the plaintiff successfully establishes a *prima facie* case, the burden then shifts to the defendant to provide a legitimate, nondiscriminatory reason for the challenged employment action. *McDonnell Douglas*, 411 U.S. at 802; *see also Scaife*, 446 F.3d at 739; *Herron*, 388 F.3d at 299.  Once the defendant has done so, the burden shifts back to the plaintiff to show that the proffered reason is merely a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804; *see also Scaife*, 446 F.3d at 739-40; *Herron*, 388 F.3d at 299.

### B.  Proceeding Under the Indirect Method, Plaintiffs Present Evidence Sufficient to Establish a Prima Facie Case of Racial Discrimination

Here, Plaintiffs admit that they do not have direct or circumstantial evidence of discrimination, and thus rely upon the *McDonnell Douglas* burden-shifting approach. (Resp. Br. 10.)  For purposes of summary judgment, Defendants concede that Plaintiffs can establish the first and third elements of their *prima facie* case. (Mem. of Law 14.)  However, Defendants

contend that Plaintiffs' *prima facie* case falters on the second and fourth elements, explaining that Plaintiffs can neither demonstrate that they performed according to their employer's legitimate expectations nor that similarly situated employees outside of their protected class were treated more favorably. (Mem. of Law 14-15.)

As to the second prong, whether Plaintiffs were meeting Defendants' legitimate expectations, Plaintiffs do not deny that they failed to finish their shift on February 9, 2007, nor do they argue at length that they were meeting Defendants' legitimate expectations.  Instead, they emphasize that three similarly situated White bargaining unit employees *also* did not finish their shift on February 9, 2007, yet were not deemed to have abandoned their jobs.  Thus, Plaintiffs contend that Defendants applied discipline in a discriminatory manner, assigning Plaintiffs much harsher consequences than similarly situated employees not in their protected class.

Indeed, the Seventh Circuit Court of Appeals has instructed that "it makes little sense in this context to determine whether [Plaintiffs were] meeting [Defendants'] legitimate expectations." *Elkhatib v. Dunkin Donuts, Inc*., 493 F.3d 827, 830-31 (7th Cir. 2007) (citing *Curry v. Menard, Inc.*, 270 F.3d 473, 477-78 (7th Cir. 2001)).  "Rather, [Plaintiffs'] argument is more appropriately considered in our analysis of pretext." *Id*. (citing *Curry*, 270 F.3d at 478).  Under these circumstances, the second and fourth prongs merge in the *McDonnell Douglas* inquiry, leading the Court to consider whether there were similarly situated individuals not in Plaintiffs' protected class who were treated differently. *Id*.; *see Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002) ("When a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate employment expectations in a disparate manner

10

. . ., the second and fourth prongs of *McDonnell Douglas* merge – allowing the plaintiff to establish a *prima facie* case, stave off summary judgment for the time being, and proceed to the pretext inquiry." (collecting cases)).

In determining whether two or more employees are similarly situated in a disciplinary case (that is, when a plaintiff claims that he was disciplined by his employer more harshly than a similarly situated employee based on a prohibited reason), a plaintiff must show that he is similarly situated with respect to "performance, qualifications, and conduct." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000); *see also Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dept.*, 510 F.3d 681, 688 (7th Cir. 2007). "This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue*, 219 F.3d at 617; *see also Peirick*, 510 F.3d at 688.

That said, the "similarly situated requirement should not be applied mechanically or inflexibly." *Peirick*, 510 F.3d at 688 (quotation marks and citation omitted). Indeed, "[i]t is important not to lose sight of the common-sense aspect of this inquiry. It is not an unyielding, inflexible requirement that requires near one-to-one mapping between employees – distinctions can always be found in particular job duties or performance histories or the nature of the alleged transgressions." *Humphries*, 474 F.3d at 405. "[T]he fundamental issue remains whether such distinctions are so significant that they render the comparison effectively useless." *Id*.

Here, Plaintiffs point to Peterson, Caccamo, and Channel, the three White bargaining unit employees who also left before completing their shift on February 9, 2007, as individuals who

11

were similarly situated to them and who were treated more favorably.  Indeed, per Plaintiffs' telling, Plaintiffs and these three employees all were bargaining unit employees, received layoff letters from Tester nearly contemporaneously, and communicated in some manner to him that they were leaving the plant.  Plaintiffs and these three employees then cleaned their respective work areas and completed their paperwork, gathered at the time clock and received Tester's condolences and his offer to provide references in the future, and departed the plant around the same time.  In fact, the only difference in conduct between Plaintiffs and these three White employees is Defendants' assertion, which Plaintiffs do not refute, that Peterson, Caccamo, and Channel became quite emotional upon receiving their layoff letters.

This distinction, however, is not so significant that it "render[s] the comparison effectively useless." *Humphries*, 474 F.3d at 405.  Regardless of their emotional state at the time, these three White employees and Plaintiffs each communicated to Tester that they were leaving prior to the end of their shift, and he wished them well upon their departure.  Moreover, while the record states that the three White employees became emotional, it also reflects that Plaintiffs were taken by surprise upon receipt of the layoff letters (Phillips Aff. ¶ 13, Thomas Aff. ¶ 13, Davis Aff. ¶ 10), suggesting that Plaintiffs may have been experiencing some unanticipated emotions of their own, which Tester either failed to observe or chose to ignore.  Based on this record, common sense dictates that Peterson, Caccamo, and Channel are indeed sufficiently similarly situated to Plaintiffs to satisfy the fourth prong of Plaintiffs' *prima facie* case, *see Humphries*, 474 F.3d at 405, and it is undisputed that these three similarly situated employees were treated more favorably.

Consequently, Plaintiffs have successfully established a *prima facie* case of racial

discrimination.

### C.  Defendants Have, Albeit Arguably, Proffered Legitimate, Nondiscriminatory Reasons for Their Employment Decision

"Once the plaintiff establishes a prima facie case of discrimination, the burden of production shifts to the defendant, who must produce some legitimate nondiscriminatory reasons for the challenged employment decision." *McKnight v. SuperAmerica Group/Ashland Oil Co.*, 888 F. Supp. 1467, 1479 (E.D. Wis. 1995) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993); *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252 (1981); *Kirk v. Fed. Prop. Mgmt. Corp.*, 22 F.3d 135, 138 (7th Cir. 1994)).  "To meet this standard, the explanation given by the defendant 'must be legally sufficient to justify a [favorable] judgment.'" *Id.* (quoting *Kirk*, 22 F.3d at 138); *see also Hicks*, 509 U.S. at 509 (explaining that to carry the burden of production at this stage, the defendant must "introduce evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action").

Under typical employment circumstances, Defendants' proffered reasons for the employment action – that Plaintiffs abandoned their jobs by leaving without permission before completing their shift and by failing to clean their work station and finish their paperwork – would easily be deemed legitimate, nondiscriminatory reasons for terminating an employee. *See, e.g., Radimecky v. Mercy Health Care & Rehab. Ctr.*, No. 00 C 2889, 2001 WL 1002521, at *10 (N.D. Ill. Aug. 29, 2001).  Yet, here, the conclusion that Defendants' proffered reasons were legitimate is more tenuous, considering that Defendants gave Plaintiffs a layoff letter stating their layoff was effective that day; that after giving them the letter, their supervisor inquired whether they were staying or leaving; and that their supervisor had full knowledge that they chose to leave because of the layoff letter.  The legitimacy of Defendants' proffered reasons

13

seems particularly questionable since three similarly situated individuals' departures about the same time were deemed "authorized."

In any event, even if we conclude, albeit arguably, that Defendants' proffered reasons are legitimate, Plaintiffs ultimately produce sufficient evidence to raise an inference that Defendants' proffered reasons for their employment decision were pretextual. *See generally Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir. 1997) (explaining that "defendant's expectations are not legitimate if they are phony"). Therefore, we will accelerate to the pretext inquiry.

### D.  Plaintiffs Have Set Forth Sufficient Evidence To Raise an Inference That Defendants' Proffered Reasons for the Employment Decision Were Pretextual

The focus for a pretext inquiry is "whether the employer's stated reason was honest, not whether it was accurate, wise or well-considered." *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006) (quoting *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000)); *see also Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 417 (7th Cir. 2006) ("[T]he question in a discrimination case is not whether the employer's stated nondiscriminatory ground for the action of which the plaintiff is complaining is correct but whether it is the true ground of the employer's action rather than being a pretext for a decision based on some other, undisclosed ground."). Simply put, pretext is "a deliberate falsehood." *Forrester*, 453 F.3d at 419.

"Pretext may be established directly with evidence that [the employer] was more likely than not motivated by a discriminatory reason, or indirectly by evidence that the employer's explanation is not credible." *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 983 (7th Cir. 1999); *see also Forrester*, 453 F.3d at 417-18; *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 548 (7th Cir. 2002). Ultimately, the plaintiff proceeding indirectly must also "provide evidence

14

of at least an inference that the real reason for their dismissal was discriminatory." *Jackson*, 176 F.3d at 983; *see also Brown v. Ill. Dept. of Natural Res.*, 499 F.3d 675, 683 (7th Cir. 2007).

However, "at summary judgment the plaintiff is not required to establish pretext *and* provide evidence of a discriminatory motive by the defendant . . . . This level of proof is only required when a plaintiff's case is submitted to a finder of fact." *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 726 (7th Cir. 2005). Rather, in order to survive a motion for summary judgment, the plaintiff "need only produce evidence from which a rational factfinder could infer that the company lied about its proffered reasons for [his] dismissal." *Id*. (quotation marks and citation omitted); *see also Forrester*, 453 F.3d at 417; *Alexander v. Wis. Dept. of Health & Family Servs.*, 263 F.3d 673, 682-83 (7th Cir. 2001); *Jackson*, 176 F.3d at 984.

Here, viewing the facts and drawing all inferences in the light most favorable to Plaintiffs, a reasonable jury could conclude that Defendants' proffered reasons for classifying Plaintiffs' terminations as voluntary resignations were a fabrication. *See generally Unterreiner v. Volkswagen of Am., Inc*., 8 F.3d 1206, 1210 (7th Cir. 1993) ("[T]here is no genuine issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party."). Notably, the layoff letters that Plaintiffs received after their lunch break on February 9, 2007, state that February 9, 2007, was their "last day of work," *not* that their layoffs were "effective after the conclusion of that workday" as Defendants represent in their memorandum supporting summary judgment. (*Compare* Mem. of Law Exs. E-G, *with* Mem. of Law 5-6.) Then, upon distributing the layoff letters, Tester asked Plaintiffs whether they would complete their shift or leave, which, in conjunction with the language of the letters, could easily suggest to Plaintiffs that they had no obligation to stay for the remainder of their shift.

15

More pointedly, Tester was fully aware of Plaintiffs' decision to leave early and that the layoff was the reason for it, as according to Plaintiffs' evidence, he stood at the time clock, wished them well, and offered to provide them references in the future. *See generally Bombard v. Fort Wayne Newspapers, Inc*., 92 F.3d 560, 562 (7th Cir. 1996) ("In reaching a conclusion as to the presence of a genuine issue of material fact, we must view the evidence and draw all inferences in a way most favorable to the nonmoving party."). Evidence which particularly casts doubt upon the honesty of Defendants' proffered reasons for the employment action is the undisputed fact that the three White bargaining unit employees departed the plant about the same time as Plaintiffs, yet were not deemed to have abandoned their jobs.

Moreover, a reasonable jury could certainly find that Defendants did not honestly believe their own assertion that Plaintiffs did not complete their paperwork or clean their work area prior to leaving the plant. In fact, Defendants now admit that Phillips was under no obligation to complete such tasks, and the record reflects a dispute of material fact with respect to whether Thomas and Davis actually performed these duties prior to leaving. *See generally Giannopoulos v. Brach & Brock Confections, Inc*., 109 F.3d 406, 410 (7th Cir. 1997) ("[B]ecause employment discrimination cases often turn on questions of intent and credibility, courts in these cases must take care as they weigh summary judgment motions not to invade the province of the factfinder by attempting to resolve swearing contests and the like."); *Tuszkiewicz v. Allen-Bradley Co., Inc*., 967 F. Supp. 1119, 1127 (E.D. Wis. 1997) ("The court must . . . be careful not to step in the shoes of the factfinder by resolving swearing matches.").

Overall, when viewing the evidence in the light most favorable to Plaintiffs, Defendants' explanation for transforming Plaintiffs' terminations into voluntary resignations indeed "smell[s]

16

'fishy.'" *Lopez v. Union Tank Car Co.*, 8 F. Supp. 2d 832, 841 (N.D. Ind. 1998); *see Russell v. Acme-Evans Co.*, 51 F.3d 64, 70 (7th Cir. 1995) (acknowledging that "[t]here may be cases in which the multiple grounds offered by the defendant for the adverse action of which the plaintiff complaints are so intertwined, or the pretextual character of one of them so fishy and suspicious, that the plaintiff could withstand summary judgment."). "In sum, this is a case where . . . 'disbelief of the reasons put forward by the defendant . . . together with the elements of the prima facie case, [may] suffice to show intentional discrimination." *Lopez*, 8 F. Supp. 2d at 841 (quoting *Hicks*, 509 U.S. at 511); *see Wilson v. AM Gen. Corp.*, 167 F.3d 1114, 1121 (7th Cir. 1999) (acknowledging that a jury could find "a combination of factors sufficiently 'fishy and suspicious' to warrant a verdict for [the plaintiff]"); *see generally Rudin*, 420 F.3d at 726 ("[I]n order to survive a motion for summary judgment, an employee need only produce evidence from which a rational factfinder could infer that the company lied about its proffered reasons for [his] dismissal." (citation omitted)).

Of course, "[r]aising an inference of discrimination does not mean a plaintiff has won the case, but rather, only that a plaintiff has merely produced enough evidence to defeat summary judgment and proceed to trial." *Jackson*, 176 F.3d at 984 (quotation marks and citation omitted). "[O]nce the employee has cast doubt upon the employer's proffered reasons for the termination, the issue of whether the employer discriminated against the plaintiff is to be determined by the jury – not the court." *Rudin*, 420 F.3d at 726 (quotation marks and citation omitted).

Consequently, Defendants' motion for summary judgment (with the exception of the claims against Defendant Lawson to be discussed *infra*) will be denied.

*E. All Claims Against Defendant Lawson Will Be Dismissed*

In their motion for summary judgment, Defendants assert that all claims against the individual Defendants – that is, CEO Esther, CFO Lawson, and Plant Manager Foley – be dismissed, contending that these Defendants cannot be personally liable for Connor's alleged violation of § 1981 if they are not purported to have participated in the actual discrimination. (Mem. of Law 21.)  In response, Plaintiffs stipulate that they lack sufficient evidence to proceed against Lawson and that he should be dismissed from this action; however, they oppose Defendants' contentions with respect to Esther and Foley, arguing that these two Defendants did indeed personally participate in the alleged discrimination against Plaintiffs. (Resp. Br. 15.) Defendants did not respond to this argument in their reply brief.

"It is true that 'personal liability under section 1981 must be predicated on the actor's personal involvement.'" *Jackson v. Local 705, Int'l Bhd. of Teamsters, AFL-CIO*, No. 95 C 7510, 2002 WL 460841, at *9 (N.D. Ill. Mar. 26, 2002); *see also Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 753 (7th Cir. 1985) ("[P]ersonal liability cannot be imposed on a corporate official for the corporation's violation of section 1981 when that official is not alleged to have participated in the actual discrimination against the plaintiff.").  "Without personal participation in the discrimination that is the subject of plaintiffs' alleged complaints, there can be no finding of intent to discriminate against plaintiffs under Section 1981, . . . and thus no liability." *McGee v. Ill. Dept. of Transp.*, No. 02 C 0277, 2004 WL 726110, at *3 (N.D. Ill. Apr. 1, 2004).

As to Foley, it is obvious that she personally participated in the alleged discrimination, as she admittedly conducted her own investigation into the events of February 9, 2007, and made the decision to convert Plaintiffs' terminations into voluntary resignations. (Foley Aff. ¶¶ 24-31.)

18

Therefore, the claims against Foley will not be dismissed.

Likewise, the claims against Esther will survive. Foley reviewed her investigatory findings and termination decisions with Esther before she communicated her decision to Plaintiffs; the record shows that Esther had the authority to override her decision, but chose not to do so. (Foley Aff. ¶¶ 42-44; Mem. of Law 22.) Therefore, he was involved, at least to some extent, in the decision-making process, which is sufficient to avoid dismissal of the claims against him at this juncture. *Compare Leadership Council for Metro. Open Communities v. Chicago Sw. Holiday Inn Operators Oak Lawn Lodge, Inc.,* No. 84 C 7564, 1085 WL 3601, at *2 (N.D. Ill. Oct. 31, 1985) (stating that for personal liability to attach under § 1981, "a plaintiff must prove that a corporate officer is personally involved, *in some manner*, in the alleged discriminatory acts" (emphasis added)), *with Green v. Motorola, Inc*., No. 96 C 7654, 1998 WL 142356, at *5 (N.D. Ill. Mar. 20, 1998) (dismissing individual defendant where plaintiff conceded that the individual defendant was not involved in the decision-making process with respect to her termination).

Consequently, Defendants' motion for summary judgment will be granted with respect to Lawson, but denied as to Foley and Esther.

## V.  CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Docket # 25) is GRANTED in that all claims against Defendant Jack Lawson are DISMISSED but is DENIED

19

IN ALL OTHER RESPECTS.

    SO ORDERED.

    Enter for the 15th day of April, 2008.

                                           <u>S/ Roger B. Cosbey</u>
                                           Roger B. Cosbey
                                           United States Magistrate Judge